```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  BYRON JACKSON,

 4                          Plaintiff,

 5                                          20 CV 3433 (CS)
        -vs-                                BENCH RULING
 6
    THE CITY OF NEW YORK, et als.,
 7
                            Defendants.
 8
    ------------------------------------x
 9      *All parties participating via telephone*

10                              United States Courthouse
                                White Plains, New York
11
                                Wednesday, June 9, 2021
12                              11:30 a.m.

13
    B e f o r e:
14                              HONORABLE CATHY SEIBEL,
                                District Judge
15

16  A P P E A R A N C E S:

17  JEFFREY A. ROTHMAN, ATTORNEY AT LAW
         Attorneys for Plaintiff
18  BY:  JEFFREY A. ROTHMAN, ESQ.

19
    NEW YORK CITY LAW DEPARTMENT
20       Attorneys for Defendants, City of New York and Individual
    Defendants
21  BY:  HANNAH V. FADDIS, ESQ.

22
    SOKOLOFF STERN, LLP
23       Attorneys for Defendant, Det. Sean Kane
    BY:  MARK ANTHONY RADI, ESQ.
24

25
```

1              THE DEPUTY CLERK:  Good morning, Judge.  Judge, this

2   matter is Jackson v. City of New York.

3              We have on the line representing Plaintiff, Mr.

4   Jeffrey Rothman, and representing the City of New York

5   Defendants, we have Ms. Hannah Faddis, and representing

6   Defendants City of New Rochelle and Detective Kane, we have Mr.

7   Mark Radi on.  Our court reporter, Tabitha, is on, and Jenny is

8   on.

9              THE COURT:  All right, good morning, everyone.

10             Let me remind Counsel, if you say anything, make sure

11  the first thing you say is your last name.  Please do not say

12  "this is Jeff Rothman," just say Rothman.  The court reporter

13  needs to know right up front who is speaking and so do I, and if

14  you don't remember to say your last name first, you'll probably

15  get interrupted, which, of course, nobody wants.

16             The pending motion is by Mr. Radi's clients.  Anybody

17  have anything to add that's not covered by the motion papers?

18             MR. ROTHMAN:  Not from Plaintiff, your Honor.

19             THE COURT:  So you didn't say your last name first.

20  You gotta say Rothman, not "not from Plaintiff, your Honor."

21             MR. ROTHMAN:  My apologies, Rothman Not From

22  Plaintiffs, your Honor.

23             THE COURT:  You gotta say Rothman, my apologies.  I

24  know it's not easy, but you really need focus and make sure you

25  do it.

1          MR. ROTHMAN:  I will, your Honor.

2          MR. RADI:  Nothing, Judge, thank you.

3          THE COURT:  All right, make yourselves comfortable

4    because this is going to take a while.

5          The motion is by the Defendants, City of New Rochelle

6    and Detective Kane, Sean Kane, collectively the New Rochelle

7    Defendants.  I accept as true the facts, but not the conclusions

8    set forth in the Second Amended Complaint, or SAC, which is

9    docket entry 49, for purposes of the motion.

10          The facts are as follows:

11          On February 4th, 2019, New York City Police

12   Department, or NYPD officers, stopped and seized Plaintiff, a

13   black male, in Queens.  The NYPD officers asked Plaintiff where

14   he was going and informed him that the night before, a woman had

15   been assaulted by a black male wearing a similar coat,

16   specifically a black flight coat or bomber jacket.  Before

17   letting Plaintiff go on his way, the officers pressured

18   Plaintiff into handing over his identification and allowing them

19   to take photographs of Plaintiff and his ID.

20          At about eight-thirty p.m. on February 8th, 2019,

21   Detective Kane of the New Rochelle Police Department, or NRPD,

22   stopped the Plaintiff in New Rochelle and told him there was a

23   warrant out for his arrest.  Plaintiff, who lives in New

24   Rochelle and knew Defendant Kane from a prior interaction, told

25   Kane that there was not a warrant out for his arrest.  Kane said

1   that he needed to check Plaintiff's identification to make sure.

2   Some time thereafter, Kane handcuffed Plaintiff and then handed

3   him off to another member of the NRPD who then drove Plaintiff

4   to the New Rochelle police station.  Plaintiff was put in a cell

5   and held there for about two hours until NYPD officers picked

6   him up and took him to Queens.  The remaining events alleged in

7   the SAC concern the NYPD Defendants who are alleged to have held

8   and interrogated Plaintiff and seized his phone and jacket

9   before ultimately letting him go and never charging him.

10        Plaintiff alleges on information and belief that

11   Defendant Kane's statement that there was a warrant out for his

12   arrest was false and that no warrant had been issued for

13   Plaintiff's arrest by any judge.  Plaintiff alleges that Kane

14   did not have knowledge of any facts that would establish

15   probable cause to arrest him, but he acknowledges that Kane

16   stopped and arrested him based on the NYPD-issued I-card that

17   explicitly stated "probable cause to arrest," see ¶ 29 of the

18   SAC.

19        Plaintiff also alleges in ¶ 23 that the NYPD issued

20   and shared the I-card with the NRPD so that the NRPD could

21   arrest Plaintiff on NYPD's behalf, but he alleges that all the

22   NYPD had on him was that he was a black male in a bomber jacket.

23   I assume that to be true for purposes of the motion, and I agree

24   that that would not suffice for probable cause to arrest.

25        The New Rochelle Defendants produced the I-card.  It's

1  Exhibit A, document 32-1.  As I'll explain shortly, I may

2  consider it in connection with the motion to dismiss.  The

3  I-card contains a picture of Plaintiff, identifies him by name,

4  address, and physical description, and reads, in all caps,

5  "wanted for rape: perpetrator-probable cause to arrest."  It

6  also provides "the above perpetrator is wanted for a sexual

7  assault that occurred on January 19th, 2019, at approximately

8  0001 hours in the vicinity of 116 Avenue and 141 Street in the

9  confines of the 113th precinct."  It further asked for anyone

10 with information concerning Plaintiff to please notify Defendant

11 Erato, and it lists Defendant Cruz as the assigned investigator.

12 Plaintiff alleges that Kane did not contact Erato, Cruz, or

13 anyone else at the NYPD before arresting him, that's in ¶ 29,

14 although he does not state what makes him think that.  He also

15 alleges that his box-cutter was confiscated upon his arrest and

16 has not been returned.

17          The procedural history is as follows:

18          Plaintiff filed his original complaint on May 1st,

19 2020.  On August 26th, I granted the New Rochelle Defendants'

20 request for a pre-motion conference.  Plaintiff filed an amended

21 complaint on August 31st, which did not amend any allegations or

22 claims against the New Rochelle Defendants.  I then had the

23 pre-motion conference on September 21st and granted Plaintiff

24 leave to amend again.  He filed the SAC on October 23rd, 2020.

25 He brings this action via alleging constitutional violations

1 under 42 U.S.C. § 1983 and related claims under New York law.

2          In his memorandum of law in opposition to the New

3 Rochelle Defendants' motion to dismiss, which is Docket entry

4 29-2, Plaintiff withdrew the following claim, the claim of an

5 unlawful Terry stop and frisk and unlawful search, that's at

6 pages 18 to 19 and note 13; equal protection under federal and

7 state law, that's at page 20; and negligence under page 21.

8          The legal standard on a motion to dismiss should be

9 well understood.  It's from *Ashcroft v. Iqbal,* 556 U.S. 662,

10 678, and *Bell Atlantic v. Twombly*, 550 U.S. 544, 570.

11 Ordinarily I don't find the need to say more than that because

12 everyone should be familiar with the plausibility standard set

13 forth in those cases, but in this case, Plaintiff cited the

14 outdated no-set-of-facts standard that originated in *Conley v.*

15 *Gibson*, even though that standard was "retired" by Twombly in

16 2007, see 550 U.S., 562-63, which was made abundantly clear in

17 *Iqbal* in 2009, see 556 U.S., 670-78.  That it may have

18 erroneously found its way into a summary order from 2010 is no

19 justification for citing it in 2021, and the summary order from

20 2010, which is *Nogbou v. Mayrose,* 400 F. App. 617, 619, and

21 found at page 3 of Plaintiff's memorandum, which is Docket 59-2.

22          The fact that one can only find that standard in a

23 summary order that's more than ten years old should have been a

24 red flag.  The no-set-of-facts standard doesn't apply anymore.

25 The standard is whether there is sufficient factual matter

1   accepted as true to state a claim for relief plausible on its

2   face, meaning it allows the Court to draw the reasonable

3   inference that the Defendant is liable, and that is done based

4   on the well-pleaded facts.  Conclusions are disregarded.

5        In deciding a motion to dismiss, a court is entitled

6   to consider the facts alleged in the complaint and documents

7   attached to it or incorporated by reference, documents that are

8   integral to the complaint and relied on it, documents in

9   defendants' motion papers if they were in plaintiff's possession

10  and relied on, as well as facts of which judicial notice can be

11  taken, *Weiss v. Incorporated Vill. of Sag Harbor*, 762 F. Supp 2d

12  560, 567, Eastern District 2011.  I may consider the I-card,

13  which Plaintiff incorporates by reference in numerous paragraphs

14  in the SAC, 23-25, 29, 56, 62-64, and 76.

15        One of the arguments Defendant Kane makes is that he's

16  entitled to qualified immunity.

17        I won't take the time to recite the boilerplate

18  regarding qualified immunity.  We're all familiar with it.  It

19  shields government officials from civil liability if that

20  official's conduct didn't violate clearly-established rights of

21  which a reasonable person would have known or if the official

22  was objectively reasonable in believing his actions were lawful

23  at the time.  That test is met if officers of reasonable

24  competence could disagree on the legality of the defendant's

25  actions.  One doesn't look at a high level of generality, such

1  as the right to be free of unlawful searches and seizures, but

2  have to look at whether the law is clearly established in a more

3  particularized sense, given the specific facts.  There doesn't

4  have to be a case directly on point, but as the Supreme Court

5  said in *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741, existing

6  precedent must have placed the statutory or constitutional

7  question beyond debate.

8          I turn first to the claims against Defendant Kane, the

9  first of which is false arrest.

10          A plaintiff has to plausibly allege that the Defendant

11  intended to confine the plaintiff, the plaintiff was conscious

12  of the confinement, the plaintiff didn't consent to the

13  confinement, and the confinement was not otherwise privileged,

14  *Norales v. Acevedo*, 2021 WL 739111, 5, Southern District,

15  February 24th, 2021.  Confinement is otherwise privileged if

16  there's probable cause, so an arresting officer can avoid

17  liability by showing either he had probable cause for the arrest

18  or he's protected from liability based on qualified immunity,

19  *Simpson v. City of New York*, 793 F.3d 259, 265.

20          A probable cause determination is objectively

21  reasonable if there was arguable probable cause at the time of

22  the arrest, meaning officers of reasonable competence could

23  disagree as to whether the probable cause test was met, *Gonzalez*

24  *v. City of Schenectady*, 728 F.3d 149, 157.

25          With respect to false arrest, dismissal is appropriate

1   when the only conclusion a rational jury could reach is that

2   reasonably competent officers could disagree under the

3   circumstances about the legality of the arrest, *Riccuiti v.*

4   *N.Y.C. Transit Auth.*, 124 F.3d 123, 128, see *District of*

5   *Columbia v. Wesby*, 138 S. Ct. 577, 589-93; *Figueroa v. Mazza*,

6   825 F.3d 89, 100, which says an arresting officer will find

7   protection under the defense of qualified immunity unless no

8   reasonably competent officer could have concluded based on the

9   facts known at the arrest that probable cause existed, and

10  *Norales* at 6, which said an officer has arguable probable cause

11  if if was objectively reasonable for the officer to believe

12  there was probable cause or if officers of reasonable competence

13  could disagree on that question.

14            Considering the allegations in the SAC and I-card, it

15  was reasonable for Defendant Kane to believe that probable cause

16  existed.  He arrested Plaintiff based on an NYPD-issued I-card

17  that explicitly stated the Plaintiff was wanted for a rape that

18  had occurred about three weeks earlier and that there was

19  probable cause to arrest him.  Nothing in the SAC suggests that

20  Kane had any reason to believe that the NYPD officers who issued

21  the I-card did not have probable cause, see *Henning versus City*

22  *of New York*, 2012 WL 2700505, 1, n. 2, Eastern District July

23  5th, 2012, which said "the NYPD issues I-cards, *inter alia*, to

24  give notice of persons thought for whom there is probable cause

25  for arrest.  [I-cards] have been described as investigation

1  cards used by members of the NYPD to alert other members of

2  probable cause to arrest the subject."

3       Plaintiff is correct that under the collective

4  knowledge doctrine, his Fourth Amendment rights will have been

5  violated if the NYPD, in fact, did not have probable cause to

6  arrest him, see *Hernandez v. United States*, 939 F.3d 191, 209,

7  where the court said the collective knowledge doctrine does not

8  apply if the initiating officer lacks probable cause, and I

9  assume for purposes of this motion that the initiating officer,

10 in fact, lacked probable cause, but this does not change the

11 fact that Defendant Kane had arguable probable cause or acted

12 objectively reasonably in believing he did, nor does it change

13 the fact that the same policy considerations underlying the

14 collective knowledge doctrine apply to the facts of this case.

15      First, as discussed, it was reasonable for Defendant

16 Kane to believe that probable cause existed even if it didn't,

17 see *Johnson v. City of New York*, 2017 WL 1476139, 7, Eastern

18 District 2017, which granted summary judgment for the defendant

19 on a false arrest claim where the defendant reasonably relied on

20 an I-card stating that there was probable cause to arrest, and

21 in that case, there actually was probable cause, but he also

22 said had probable cause been absent, the defendant might

23 nevertheless be able to avoid liability for arresting plaintiff

24 if he reasonably relied on an I-card or other communication from

25 a supervisor or fellow officer, *Golphin v. City of New York*,

1   2011 WL 4375679, *3, Southern District, September 19th, 2011,

2   which said "the only concern of the court in this lawsuit is

3   whether the defendant's actions were reasonable, not whether the

4   actions of his superior officers were reasonable or even whether

5   probable cause was properly established"; *Johnson v. Anhorn*, 416

6   F. Supp 2d 338, 363, Eastern District of Pennsylvania 2006,

7   where the courts found it unreasonable for the arresting officer

8   to rely on vague, inconclusive statements relating to rumors of

9   an arrest warrant without ever obtaining a clear statement

10  confirming the existence of probable cause for the suspect's

11  arrest, holding that where a police officer makes an arrest on

12  the basis of oral statements by fellow officers, the officer

13  will be entitled to qualified immunity provided it was

14  objectively reasonable for him to believe on the basis of the

15  statements that probable cause existed, see also *U.S. v.*

16  *Hensley,* 469 U.S. 221, 232, where the Supreme Court said "if the

17  flyer has been issued in the absence of reasonable suspicion,

18  then a stop in objective reliance upon it violates the Fourth

19  Amendment.  In such a situation, of course the officers making

20  the stop may have a good faith defense to any civil suit."  So

21  those cases all suggest even where probable cause is lacking,

22  qualified immunity is appropriate.

23          Second, "the basis of the collective knowledge

24  doctrine is that officers must be able to assume the information

25  relayed by their colleagues is accurate and reliable in order

1  for law enforcement to operate effectively."  That's *Golphin* at

2  \*2.  "The doctrine has traditionally been applied to assist

3  officers in establishing probable cause, not to impute bad faith

4  to one member of an enforcement team on the basis of another

5  member's knowledge," *Savino v. City of New York*, 331 F.3d 63,

6  74.

7          Here, Defendant Kane had no reason to believe that the

8  information in the NYPD-issued I-card was incorrect or

9  unreliable.  He therefore should be able to "assume that the

10  information conveyed by his colleagues was accurate and

11  reliable," *Golphin* at \*2.  It would be extremely inefficient if

12  Kane had to conduct a further investigation into the facts

13  underlying the NYPD's probable cause determination, see *Golphin*

14  at \*3 where the Court said "if an Officer...could be held liable

15  for trusting the word of his superiors, then officers would be

16  discouraged from relying on each other during investigations,

17  which would degrade the efficiency of law enforcement."

18          The Second Circuit made clear in *Hernandez* that it

19  "did not hold that an officer is required to investigate every

20  claim of innocence."  That's *Hernandez* at 208.  In that case,

21  there was a discrepancy in the names between the wanted person

22  and the arrestee and the arrestee's citizenship could have been

23  verified with minimal effort, so in that case, the City was not

24  free to ignore a claim of innocence and proceed, but the court

25  said the officer need not conduct a mini trial before making an

1  arrest, but it noted that probable cause does not exist when

2  minimal further investigation would have exonerated the suspect.

3  Further, generally neither a suspect's denials nor an officer's

4  failure to investigate them are sufficient to vitiate probable

5  case, *Weiner v. McKeefery,* 90 F. Supp. 3d 17, 31-32, Eastern

6  District 2015, which collects cases.  Those cases preceded

7  *Hernandez*, but *Hernandez* was a case involving minimal effort.

8           Here, Plaintiff does not even allege that he claimed

9  innocence.  He merely alleges that he told Detective Kane that

10 there was no warrant out for him, see SAC ¶ 26, but even if he

11 had claimed innocence of the underlying charge, Kane was not

12 obligated to accept that claim, and there is no indication that

13 Plaintiff gave Kane any concrete reason to doubt the NYPD's

14 representation that probable cause existed or any factual

15 information that Kane could have verified on the spot or with

16 minimal effort.  "The arresting officer does not have to prove

17 the plaintiff's version wrong before arresting him, nor does it

18 matter that an investigation might have cast doubt upon the

19 basis for the arrest." *Curley v. Vill. of Suffern*, 268 F.3d 65,

20 70.  Relatedly, Plaintiff does not allege that he disputed any

21 identifying information.  Even if Plaintiff had said something

22 along the lines of "you have the wrong person," which he didn't,

23 Kane would still have acted reasonably by arresting Plaintiff

24 because the I-card contained a head shot photo of Plaintiff,

25 along with his name, description, date of birth, and address,

1  and Defendant Kane checked Plaintiff's identification before

2  cuffing him.  Plaintiff suggests that because Kane told

3  Plaintiff that there was a warrant for his arrest when actually

4  there was only an I-card, Kane had bad intent and is not

5  entitled to qualified immunity.

6          I am dubious that Kane's statement bears the weight

7  Plaintiff puts on it.  It may show that he was oversimplifying

8  or he did not appreciate the difference between an arrest

9  warrant and an I-card or that he was trying to trick Plaintiff,

10 but even assuming it showed bad intent, subjective intent is

11 irrelevant on the qualified immunity issue under § 1933.  See,

12 e.g., *Sanchez v. Bonacchi,* 759 F. App. 60, 62, where the Circuit

13 said that by relying on Defendant's subjective intent or belief

14 as to the state of the law to determine whether he was entitled

15 to qualified immunity, the District Court erred; *Aoutif v. City

16 of New York*, 2019 WL 2410450, 12, Eastern District, May 31st,

17 2019, where the court said subjective intent is not relevant to

18 the objective qualified immunity standard unless evidence of

19 improper motive is an element of the plaintiff's claim as

20 defined by clearly-established law, but because unlawful intent

21 is not an element of a Fourth Amendment claim, the defendant's

22 subjective intent is irrelevant to the qualified immunity

23 analysis, and that was affirmed 811 F. App. 711.

24         Assuming for the sake of argument that it was not

25 reasonable for Defendant Kane to rely solely on the I-card, he

1  would still be entitled to qualified immunity because, as

2  Defendants point out, it was not clearly established at the time

3  of the incident that an officer or detective violates the

4  Constitution by detaining a suspect based on a wanted poster or

5  flyer or I-card issued by a different law enforcement agency

6  that states there's probable cause to arrest.  See *Wesby* 138 S.

7  Ct., 591, which found qualified immunity appropriate where the

8  illegality was not obvious and no precedent, much less a

9  controlling case or robust consensus of cases, have found a

10  Fourth Amendment violation under similar circumstances, and also

11  Wesby, 590, which noted that given the imprecise nature of the

12  probable cause standard, the Supreme Court has stressed the need

13  to identify a case where an officer acting under similar

14  circumstances was held to have violated the Fourth Amendment.

15          Indeed, as another judge of this court explained in

16  *Golphin* at page 2, the collective knowledge doctrine shields

17  arresting officers when the basis of probable cause is later

18  found false or mistaken, citing the Circuit's *Valez* case, 796

19  F.2d, 28, which established that undisclosed information that

20  undermines probable cause cannot be imputed to the arresting

21  officer and went on to say that in a chain of communication

22  between officers, responsibility for the accuracy of probable

23  cause remains with the officer that provided the affirmation,

24  not the arresting officer.

25          Indeed, here, Plaintiff was arrested on September 8,

1   2019, which was before the Second Circuit on September 17th of

2   that year decided in *Hernandez* that the collective knowledge

3   doctrine does not void a Fourth Amendment violation where the

4   initiating officer lacked probable cause and introduced the

5   minimal further investigation standard, so it is hard to see how

6   Kane could have known that he was risking a constitutional

7   violation by accepting at face value the NYPD representation

8   that probable cause to arrest existed.

9           To be clear, I am not suggesting that in every case an

10  officer can necessarily rely solely on an I-card stating that

11  there is probable cause.  I am only finding that in this case

12  qualified immunity applies.  I am assuming that the NYPD did

13  not, in fact, have probable cause to arrest Plaintiff and the

14  arrest, therefore, violated his Fourth Amendment rights, but the

15  question with respect to qualified immunity is whether it would

16  have been clear to any reasonable officer that he was required

17  not to credit the NYPD representation that probable cause to

18  arrest existed and I find that it would not.

19          Turning now to the due process claim against Kane,

20  those claims also fail.

21          Plaintiff does not dispute that his allegations do not

22  support a substantive due process claim, so that claim is

23  abandoned, see *Horsting v. St. John's Riverside Hosp.*, 2018 WL

24  1918617, at *6, S.D.N.Y., April 18th, 2018.  Plaintiff also does

25  not dispute that his due process claim is based upon his arrest,

1  so that claim is duplicative.  See *Rockland Vending v. Creen*,

2  2009 WL 2407658, at *4, Southern District, August 4th, 2009,

3  which says that a due process claim relying on the same facts as

4  a false imprisonment claim cannot be sustained.

5          Next is a claim for failure to intervene.

6          It is well settled that law enforcement officers have

7  an affirmative duty to intervene to protect the constitutional

8  rights of citizens from infringement by other law enforcement

9  officers in their presence, and an officer who fails to

10 intercede in a constitutional violation by another officer is

11 liable for the preventable harm caused by the actions of the

12 other officers, *Terebesi v. Torreso*, 764 F.3d 217, 243.

13 Plaintiff has not alleged a constitutional right violation by

14 any other officer in which Kane could have intervened, and to

15 the extent he argues that the unnamed officer who transported

16 Plaintiff to the police station after Kane arrested Plaintiff

17 failed to intervene, that Officer, Michael Moe as he is called,

18 would be entitled to qualified immunity for the same reasons as

19 Kane, so the failure-to-intervene claim is dismissed.

20         Turning now to supervisory liability, that's not a

21 claim in itself, but, rather, a theory under which a supervisor

22 can be liable under § 1983 for the constitutional violations of

23 her subordinates.  See *Emanuel v. Griffin,* 2015 WL 1379007, at

24 *15, S.D. March 25th, 2015, and *Clark v. Sweeney,* 312 F. Supp 2d

25 277, 296-97, D. Conn. 2004.

1        Plaintiff alleges in ¶¶ 55-57 that Kane failed to

2   properly train, screen, supervise, or discipline his

3   subordinates, but the Circuit changed the law on supervisory

4   liability last year in *Tangreti v. Bachmann*, 985 F.3d 609, 618,

5   holding that a -- to state a 1983 claim against a supervisor, a

6   plaintiff must "plead and prove that each government official

7   defendant through the official's own individual actions has

8   violated the constitution."  The conclusory allegations that

9   Kane failed to remedy wrongs committed by subordinates or to

10  design proper procedures or properly train, screen, supervise,

11  or discipline fail to meet this standard.

12        Plaintiff provides no facts about Kane's supervision

13  or anybody's supervision of anyone who violated Plaintiff's

14  rights.  Moreover, Plaintiff has abandoned the claim by failing

15  to address the Defendant's argument in support of it, *Horsting*

16  at *6.  Plaintiff doesn't dispute that he's failed to plausibly

17  allege supervisory liability, but, rather, merely asserts it's

18  premature to dismiss because no supervisors have been identified

19  and amended into the action.  That's in his brief at Doc. 59-2

20  at page 21, but there he has it backwards.  If he does not know

21  anything about what any supervisors might have done, he does not

22  have a plausible supervisory liability claim.  *Iqbal* makes clear

23  that a plausible claim must come before discovery, not the other

24  way around.

25        I turn now to the claims against the City of New

 1  Rochelle.

 2          Defendant argues that there is no Monell claim.  We

 3  all know that municipalities aren't liable under 1983 unless

 4  action pursuant to some municipal policy caused the

 5  constitutional tort.  There's no *respondeat superior* on the part

 6  of municipalities, so to state a municipal liability claim based

 7  on the acts of a public official, a plaintiff has to prove

 8  actions taken under color of law that result in a deprivation of

 9  a constitutional right, causation, damages, and that the

10  official policy of the municipality caused the constitutional

11  injury, *Roe v. City of Waterbury*, 542 F.3d 31, 36.

12          To meet that last requirement of an official policy, a

13  plaintiff can assert a formal policy, actions or decisions by

14  officials with final decision-making authority, a practice so

15  persistent and widespread that it amounts to a custom of which

16  constructive knowledge can be imputed to policymakers, or a

17  failure by policymakers to train or supervise, amounting to

18  deliberate indifference to the rights of those who come in

19  contact with the employee, *Betts v. Shearman,* 2013 WL 31124, at

20  *15, S.D.N.Y. January 24th, 2013, affirmed 751 F.3d 78.  Mere

21  allegations of a municipal custom, a practice of tolerating

22  official misconduct, or inadequate training or supervision are

23  insufficient to demonstrate the existence of such a custom

24  unless supported by factual details, *Tieman v. City of Newburgh*,

25  2015 WL 1379652, page 13, S.D. March 26, 2015.

1         That is all Plaintiff provides here, mere conclusory

2    allegations unsupported by facts.  Plaintiff appears to be

3    claiming an alleged City of New Rochelle unofficial policy

4    relating to I-cards and to unlawfully seizing and searching

5    arrestee's property and not returning it, that's in ¶¶ 63 and

6    64, which describe alleged de facto policies, but "boilerplate

7    claims do not rise to the level of plausibility required to

8    state a viable *Monell* claim," *Guerrero v. City of N.Y.,* 2013 WL

9    673872 at *2, S.D., February 25th, 2013, see *Betts* at *15.

10         Plaintiff argues that he provided "detailed

11   allegations of the unlawful seizure of, slash, failure to

12   voucher, slash, failure to return Plaintiff's box-cutter,

13   jacket, and cell phone, and NR's policies and practices related

14   to the same," that's at *17, but Plaintiff merely details what

15   happened to him, that his box-cutter was taken away and not

16   returned.  The facts relating to the jacket and cell phone do

17   not relate to New Rochelle.  With respect to the alleged I-card

18   policy, Plaintiff similarly does not provide any facts showing

19   that the City had any policy, pattern, practice, or custom or

20   that a policymaker was aware of or approved the alleged

21   practice.

22         Assuming the Plaintiff was arrested solely on reliance

23   of the I-card, Plaintiff does not provide any facts suggesting

24   that Kane or any other New Rochelle officers previously made

25   arrests based solely on the issuance of I-cards or otherwise

1 that there was any NRPD policy in that regard.  At best,

2 Plaintiff identifies a single experience, his own, and nothing

3 more.  As Defendants put it in Docket entry 68, page 2,

4 Plaintiff "tailored the allegations of theoretical policies to

5 mirror the single alleged incident involving only himself.  One

6 incident cannot be construed as a policy or custom."  See *Jones*

7 *v. Town of East Haven*, at 691 F.3d 72, 81, 2d Cir. 2012, which

8 found isolated acts insufficient; *Ricciuti v. N.Y.C. Transit*

9 *Auth.*, 94 F.2d, 123, which found a single incident alleged in

10 the complaint to be insufficient; *Mandel Brock v. City of New*

11 *York*, 2013 WL 6176338, at *2, E.D., November 25th, 2013, which

12 said "the complaint does not include any facts demonstrating the

13 existence of a policy or custom, rather, it only extrapolates

14 from plaintiff's single detention by defendant pursuant to a

15 "non-judicial warrant," that a policy exists regarding their

16 utilization in a discriminatory manner, a single incident

17 alleged in a complaint, especially if it involves only actors

18 below the policy-making level, generally will not suffice to

19 raise an inference of the existence of a custom or policy";

20 *Barros v. Claytor*, 2020 WL 2292173, at *4, D. Mass, June 7th,

21 2010, finding a single incident inefficient.

22         For all we can tell from the SAC, the NRPD may have no

23 policy on the subject of I-cards at all or it may have a policy

24 of not taking I-cards at face value that Kane disregarded or it

25 may have a policy of not taking I-cards at face value which Kane

1   followed or it has the policy that Plaintiff alleges.  Without a

2   single fact about any situation or practice other than

3   Plaintiff's own, Plaintiff has not nudged his *Monell* claim

4   across the line from the conceivable to the plausible, see

5   *Twombly,* 570.

6          Plaintiff's failure-to-train-or-supervise theory also

7   fails.  Under a failure to train theory, a plaintiff must

8   identify a specific deficiency in the defendant's training

9   program and establish that it's closely related to the ultimate

10  injury such that it actually caused the constitutional

11  deprivation, *Wray v. City of New York*, 490 F.3d 189, 196.  A

12  plaintiff must also allege facts supporting the inference that

13  the City failed to train its employees and did so with

14  deliberate indifference, *Dumel v. Westchester County*, 2021 WL

15  738365, at *6, S.D. February 25th, 2021.

16         Here, Plaintiff doesn't provide any information about

17  the training of the officers involved, let alone identify a

18  specific deficiency in their training.  Even if he had,

19  Plaintiff's alleged incident of misconduct "in no way suggests a

20  deliberate choice by municipal policymakers to turn a blind eye

21  to unconstitutional conduct," *Abreu v. New York,* 657 F. Supp. 2d

22  357, 361, E.D. 2009.  See *Corbett v. City of New York*, 2016 WL

23  7429447, at *6, S.D. December 26th, 2016, which said the Court

24  would not infer a deficiency in training from speculation based

25  on a single alleged constitutional violation and that to do so

1 would be to entertain a claim that falls uncomfortably close to

2 municipal vicarious liability which is not cognizable under §

3 1983.

4           I said at the September 21st, 2021, pre-motion

5 conference that the supervisory liability claim was a hundred

6 percent conclusory, see *Cotto v. City of New York,* 803 F. App'x

7 500, 504.  As a result, Plaintiff -- or maybe not as a result,

8 but in the SAC, Plaintiff added a phrase to his supervisory

9 liability claim about failing to design and implement proper

10 procedures to ensure the existence of probable cause for I-card

11 arrests, but this generality does not plausibly suggest a

12 failure of training.  For all we can tell, Kane was properly

13 trained and failed to follow his training.  Jumbling a string of

14 constitutional-sounding words together is no substitute for

15 factual allegations.  See *Cuevas v. City of New York*, 2009 WL

16 4773033, at *4, S.D., December 7th, 2009, where Judge Preska

17 said "while these allegations are heavy on descriptive language,

18 they are light on fact."

19           Finally, Plaintiff has not pleaded or even argued that

20 the City acted with deliberate indifference in connection with

21 its training program, let alone provided facts plausibly showing

22 such indifference.  Rather, Plaintiff again merely argues that

23 discovery is needed to determine what sorts of actions or

24 inactions were or were not taken by New Rochelle to evaluate

25 Detective Kane as part of his hiring and thereafter in

1 screening, retaining, supervising, and training him, whether his

2 actions or inactions were or were not in keeping with New

3 Rochelle's procedures or whether they indicate that New Rochelle

4 knew or should have known of his propensity to violate people's

5 rights, that's at pages 21 to 22, but, again, Plaintiff has it

6 backwards.  There must have been a plausible claim before

7 discovery, and the fact that Plaintiff bringing 1983 claims

8 cannot be expected to know the details of a municipality's

9 training programs prior to discovery, "this does not relieve

10 them of their obligation under *Iqbal* to plead a facially

11 plausible claim," *Stoeckley v. City of Nassau,* 2015 WL 8484431,

12 at *2, E.D., December 9th, 2015.  See *Doe v. City of New York*,

13 2013 WL 796014, 2, S.D., March 4th, 2013, where Judge Shinlin

14 said "the difficulty of pleading guilty prior to discovery does

15 not relieve plaintiff from the obligation to plead facts

16 sufficient for this Court to reasonably infer that the City's

17 failure to train caused constitutional rights to be violated,"

18 and that was affirmed at 558 F. App'x 75, and to the same

19 effect, *Simms v. City of New York*, 2011 WL 4543051, at *2 n.3,

20 E.D., September 28th, 2011, which collects cases and was

21 affirmed at 480 F. App. 627.

22        In short, Plaintiff's complaint "succinctly

23 states...the core legal concepts animating *Monell* liability, but

24 it does absolutely nothing else.  No factual matter of any kind

25 accompanies Plaintiff's rote recitation of *Monell,* and the

1   sparse facts that elsewhere make their way into the pleading and

2   which outline a single detached incident of misconduct by

3   a...non-policy-level officer in no way suggests a deliberate

4   choice by municipal policymakers to turn a blind eye to

5   unconstitutional conduct."  That's at *Abreu,* 657 F. Supp. 2d,

6   at 360-361.  The 1983 claim against the City of New Rochelle is

7   therefore dismissed.

8           I turn now to the state law claim.

9           First I address intentional infliction of emotional

10  distress, or IIED, and negligent infliction of emotional

11  distress, or NIED.

12          Plaintiff failed to oppose and thus has abandoned his

13  NIED claim against both Defendants and his IIED claim against

14  the City of New Rochelle, see *Horsting* at *6 and *Johnson v. City*

15  *of New York*, 2017 WL 231924, at *17, S.D., May 26th, 2017.

16          That leaves the IIED claim against Kane.  It fails for

17  several reasons.  First, an IIED claim does not lie where the

18  conduct is covered by another tort.  See *Pateman v. City of*

19  *White Plains*, 2020 WL 1497054, 25, S.D. March 25th, 2020,

20  collecting cases, and here, false arrest covers the claim.

21  Further, Plaintiff does not come close to sufficiently pleading

22  an IIED claim, which requires, one, extreme and outrageous

23  conduct; two, intent to cause severe emotional distress; three,

24  a causal connection between the conduct and the injury; and

25  four, severe emotional distress, *Friedman v. Self Help Cmty.*

1   *Servs.,* 647 F. App. 44, 47.  The first element sets a high bar

2   to relief, requiring extreme and outrageous conduct which so

3   transcends the bounds of decency as to be regarded as atrocious

4   and intolerable in a civilized society, *Turley v. ISG*

5   *Lackawanna, Inc.*, 774 F.3d 140, 157.  Plaintiff's allegations

6   that Kane said there was a warrant when there was only an I-card

7   and arrested him based on an I-card from another department

8   stating that probable cause existed do not rise to the required

9   level.  See *Murphy v. City of Rochester*, 986 F. Supp 2d 257,

10  271, W.D. 2013.  Even if they did, Plaintiff pleads no facts

11  showing that Kane intended to cause Plaintiff emotional distress

12  or that Plaintiff even suffered any severe emotional distress,

13  so the IIED and NIED claims are dismissed.

14          That leads me next to assault, battery, and trespass.

15          Plaintiff brings assault and battery claims based on

16  his being handcuffed.  An assault is an intentional placing of

17  another person in fear of imminent harmful or offensive contact

18  and a battery is an intentional wrongful physical contact

19  without consent, *United Nat'l Ins. Co. v. Waterfront N.Y.*

20  *Realty*, 994 F.2d 105, 108.

21          If the arrest is found to have been lawful, these

22  claims will go away because a lawful arrest is not an assault or

23  battery under New York law as long as the force used is

24  reasonable, *Figueroa v. Mazza*, 825 F.3d 89, at 105, n. 13.

25  Here, there are no allegations that the force Defendant Kane

1  used was unreasonable.  In fact, there are no allegations he

2  used any force at all.  If, however, the arrest is found to have

3  been unlawful, a technical assault or battery might have

4  occurred, *Johnson v. Suffolk County*, 665 NY Supp. 2d 440, 440,

5  2d Dept. 1997, which held that a police officer committed a

6  battery when he touched the plaintiff during an unlawful arrest.

7  We will not know whether the arrest was lawful until we know

8  whether the NYPD had probable cause to arrest the Plaintiff.

9          Defendants' arguments that "New York common-law grants

10 Government officials qualified immunity on state law claims,

11 except where the official's actions are undertaken in bad faith

12 or without reasonable basis," that's Doc. 58-4 at page 12, n.9,

13 is better suited for a motion for summary judgment or trial

14 because whether the Defendant acted in bad faith is a subjective

15 question under state law.  "While qualified immunity under

16 federal law is an objective inquiry, New York's qualified

17 immunity had both an objective component (reasonableness) and a

18 subjective component, making qualified immunity unavailable if

19 there are undisturbed findings of bad faith," *Hargroves v. City*

20 *of New York*, 2014 WL 1271024, 3, E.D., March 26th, 2014.  See

21 *Norton v. Town of Islip*, 2013 WL 84896, at *2-3, E.D. 2013,

22 which said "under New York law, a defendant's claim of qualified

23 immunity is undone by her failure to disprove either

24 reasonableness or bad faith.  With these conclusions of law in

25 mind, the Court now recognizes that it erred in dismissing the

1  state malicious prosecution claims against defendant solely

2  because the defendants had a reasonable basis," and *Rosen v.*

3  *City of New York,* 355 at 363, S.D. 2009, where the Court said

4  that because it could not determine whether the defendant had

5  acted unreasonably or in bad faith, the Court could not find as

6  a matter of law that the defendant was entitled to immunity.

7  While all Plaintiff alleges, suggesting that Defendant Kane had

8  bad faith, is that he lied about having an arrest warrant,

9  taking the facts in a light most favorable to Plaintiff, I

10  cannot, at this stage, rule out bad faith, so the assault and

11  battery claim on which the damages would be minimal given the

12  lack of force or injury remain against Kane and against the City

13  on a *respondeat superiore* theory.   That said, it seems like a

14  claim that would result in only nominal damages.

15          MR. ROTHMAN:  I'm sorry, your voice trailed off in the

16  last bit.  Could you repeat that last phrase, please?

17          THE COURT:  Yes, I said I think the claim in any event

18  would result only in nominal damages, but it survives.  The

19  trespass claim, however, is dismissed as duplicative of the

20  assault and battery claim as Plaintiff seems to recognize at

21  page 23.

22          Next, there is a conversion, slash, replevin claim

23  based upon on the box-cutter being confiscated and never

24  returned.

25          The Defendants argue that the NRPD can't return it

1  because they don't have it, but Mr. Radi's statement to that

2  effect in his declaration in ¶ 6 that he believes the box-cutter

3  was given to the NYPD is outside of the pleadings and can't be

4  considered on this motion, nor is it on personal knowledge, so I

5  couldn't consider it even on the summary judgment motion, so the

6  conversion claim survives, but maybe the City should go to Home

7  Depot and spend 8.99 on getting Plaintiff a new box-cutter to

8  get this case to go away, particularly since the assault and

9  battery claim on a Rule 68 offer, anyone would be hard-pressed

10  to turn that down, but that's just some free advice, which is

11  worth what you paid for it.

12          The remaining claims this Plaintiff has fall under the

13  New York State Constitution.

14          Both claims fail because Plaintiff does not allege any

15  state constitutional injuries that are not otherwise recognized

16  under federal or state law.  See *Alwan v. State of New York*,

17  2019 WL 204836, at *10, E.D. May 2nd, 2018, where the court said

18  "New York courts have held that a private right of action for

19  violations of the state constitution is unavailable if an

20  alternative remedy is available elsewhere, such as under state

21  tort law"; Davis versus City of New York 959 F. Supp 2d 324,

22  368, S.D. 2013, which said "New York courts will only apply a

23  private right of action under the state constitution where no

24  alternative remedy is available to Plaintiff"; *Flores v. City of*

25  *Mount Vernon,* 41 F. Supp 2d 439 at 447, S.D. 1999, which said no

1  private right of action exists for violations of the New York

2  State Constitution where a Plaintiff has alternative damages

3  remedies available.

4          Plaintiff argues that he pleads the state

5  constitutional claims in the alternative should there turn out

6  to be no alternative remedy under Plaintiff's other federal or

7  state law claims, that's at page 21 of his brief, but "it is the

8  availability of remedies under § 1983 and not their success that

9  precludes a New York State Constitutional claim," *Sullivan v.*

10 *MTA Police*, 2017 WL 4326058, at *10, S.D., September 13th, 2017.

11         Lastly, I address punitive damages.

12         Plaintiff failed to oppose Defendant's argument that

13 the City of New Rochelle is immune from punitive damages, so

14 that claim is abandoned.

15         With respect to the claim for damages against Kane,

16 Defendants argue his conduct does not reach the threshold

17 necessary for punitive damages because the arrest was based on

18 an I-card stating there was probable cause.  That claim is now

19 out as to Defendant Kane.  All that remains is the assault and

20 battery claim.

21         There are cases that dismiss punitive damages claims

22 on the pleadings, but the better course is to develop the facts

23 through complete discovery.  See *Santiago v. Pyramid Crossgates,*

24 742 NY Supp. 2448, 450, which said "defendant's arguments that

25 the evidence does not support punitive damages may be raised in

1 a smarmy motion, but they are not appropriate on this motion to

2 dismiss."  That said, I can't imagine how the assault and

3 battery claim would at that stage rise to the level of punitive

4 damages, given that there's actually no complaint about the

5 manner in which the arrest was made.

6       Finally, leave to amend should be freely given when

7 justice so requires, but it's within my sound discretion to

8 grant or deny leave to amend, *McCarthy v. Dun & Bradstreet,* 483

9 F.3d 184, 200.  Leave to amend, though liberally granted, may

10 properly be denied for, among other things, undue delay,

11 repeated failure to cure deficiencies by amendments previously

12 allowed out of futility, *Ruotolo v. City of New York*, 513 F.3d

13 184, 191.

14       Here, Plaintiff has already amended twice, both times

15 after having the benefit of a pre-motion letter from Defendants

16 outlining their proposed grounds for dismissal and once after

17 the benefit of the discussion at the pre-motion conference.

18 Plaintiff's failure to fix the deficiencies in his previous

19 pleadings, after being provided ample notice of them, is alone

20 sufficient grounds to deny leave to amend *sua sponte,* see *In Re*

21 *Eaton Vance*, 380 F. Supp 2d 222, 242, S.D. 2005, affirmed 481

22 F.3d 110, 118, and *Payne v. Malemathew*, 2011 WL 3043920, at *5,

23 S.D., July 22nd, 2011.

24       Further, Plaintiff has not asked to amend again or

25 otherwise suggested that he is in possession of facts that will

1  cure the deficiencies identified in this opinion, so I decline

2  to grant leave to amend *sua sponte.*  See *TechnoMarine v.*

3  *Giftports*, 758 F.3d 493, 505; *Gallop v. Cheney*, 642 F.3rd 364,

4  369.  See also *Loreley Fin. v. Wells Fargo,* 797 F.3d 160, 190.

5          So the motion is granted in part and denied in part.

6  The clerk should terminate Motion No. 68.

7          I strongly suggest, Mr. Radi and Mr. Rothman, that you

8  talk about resolving these very low-dollar claims or that the

9  Defendant make a Rule 68 offer, but, again, that's just free

10 advice.

11         We now need to set a schedule for discovery.

12         What time frame, Mr. Rothman, do you think will be

13 necessary?

14         MR. ROTHMAN:  Your Honor, thank you, I just wanted to

15 make your Honor aware that I found out today upon making a

16 further inquiry with the firm representing the widow of the

17 deceased NYPD Detective Abear that the letters of administration

18 were issued last month, so I understand your Honor has ruled I

19 can't amend as to the New Rochelle Defendants, but there is that

20 outstanding matter of substituting in the estate of Detective

21 Abear, so I would ask for leave to do that within, within the

22 next couple of weeks.

23         In terms of a discovery schedule, I would add -- I'm

24 going to be away the entirety of August.  If we could have until

25 the end of the year to do fact discovery, I think that would

1   make sense given the fact that we have two police departments

2   involved.  Whether or not -- and, you know, I understand that

3   your Honor has dismissed most of the claims against the New

4   Rochelle Defendants, but there still will need to be depositions

5   taken of them in connection with this...this case and their

6   involvement in it, in addition to the multiple NYPD defendants,

7   so that would be my suggestion.

8          And if your Honor would allow, just to provide a

9   little clarification as to your ruling, am I correct that your

10  Honor in addition to leaving the assault and battery claims in

11  against Detective Kane, you have also left in the conversion

12  claims concerning the box-cutter?  I'm correct?

13         THE COURT:  Yeah.

14         MR. ROTHMAN:  Okay.  But your Honor has not addressed

15  the federal claims related to the box-cutter under the Fourth

16  Amendment for the seizure of the box-cutter.

17         THE COURT:  I guess I didn't appreciate that there was

18  one, but the -- if it's in there, I wouldn't dismiss it because

19  the allegation is it was seized and not returned.  I didn't see

20  any argument.  I'm sure the seizure was incident to arrest, so

21  there would be QI for the officer, but I guess maybe I shouldn't

22  assume.

23         I don't see how -- you know, unless there was

24  something more than just, you know, they seized it, what would

25  -- why there wouldn't be qualified immunity to -- you know, you

1  arrest someone on an I-card and you search them and you give

2  their personal possessions to the officers who wanted him, if it

3  turns out that's what happened, I can't imagine that that claim

4  would survive, but I guess it survives for the moment if it's in

5  there.  I certainly didn't appreciate, maybe it's my failing,

6  that there was a Fourth Amendment claim based on the box-cutter.

7          MR. ROTHMAN:  Yes, your Honor.

8          THE COURT:  But since there is, I have not dismissed

9  it.

10          MR. ROTHMAN:  Okay, understood.  Okay, thank you very

11  much.

12          THE COURT:  All right.

13          Does Defense Counsel think six months is reasonable?

14          MR. RADI:  Yes, Judge, and if there is a Fourth

15  Amendment seizure claim, if I could just address it in a letter,

16  I'd appreciate that.

17          THE COURT:  All right, but you know...all right, fine.

18  I still think --

19          MR. RADI:  That would be covered under the qualified

20  immunity ruling.

21          MR. ROTHMAN:  Your Honor, if I could interject, I

22  understand the ruling with regard to the initial seizure of Mr.

23  Jackson's person in terms of qualified immunity for Detective

24  Kane, but it's the same issue with regard to the discarding of

25  the box-cutter that tracks, in a sense, the conversion claim, so

1 there were two separate Fourth Amendment-related claims

2 concerning the box-cutter, first for seizing it alongside of,

3 you know, Mr. Jackson's person, and then it's just for throwing

4 it away and, and seizing it by not returning it to him and

5 destroying it.

6          THE COURT:  Well, yeah.  I mean, like I said, if I

7 were you, Mr. Radi, I can't imagine that your client or whatever

8 insurance company is paying good money to have this conversation

9 wouldn't rather have spent 8.99 to give the man a box-cutter.

10 That seems like a much more...simple solution, but you'll do

11 what you want.  I just can't imagine why the client would rather

12 pay you to write a letter or to make a summary judgment motion

13 than to just make an offer on a claim that, you know -- even if

14 it's the world's fanciest box-cutter, what does it cost, twenty

15 bucks?  They just spent that much in the last two minutes or the

16 last five minutes while we're having this conversation, so...

17          I haven't dismissed it because I hadn't appreciated it

18 was in there, but, you know, you should make it go away.  That's

19 my advice.

20          MR. RADI:  I'm on HomeDepot.com right now, so...

21          THE COURT:  Heh, heh, heh.

22          All right, Ms. Faddis, are you okay with six months

23 for fact discovery?

24          MS. FADDIS:  Yes, your Honor.

25          THE COURT:  All right, so I'm going to fill out a

1  discovery order while we're sitting here.

2          You've asked for a jury trial, right, Mr. Rothman?

3          MR. ROTHMAN:  Yes, your Honor.

4          THE COURT:  Yes, you have.

5          I'm going to say amended pleadings substituting the

6  Estate of Abear may be filed in two weeks, so that's June 23rd.

7  Otherwise, everything stays the same.

8          Miss Faddis, you'll -- am I correct that you will be

9  representing the estate?  Is that how that works?

10          MS. FADDIS:  Yes, that's my understanding, your Honor.

11          I will note just for the record that the Court may be

12  aware, at present the free law department doesn't have access to

13  its e-mail or filing servers, so I do not have the benefit of

14  reviewing the file in this moment.  My recollection, though, is

15  the there is no impediment that I'm aware of to our

16  representation of Detective Abear, his estate, so that should be

17  the case, yes.

18          THE COURT:  All right.  Yes, we have been getting

19  updates from our chief justice in the law department.  An

20  unfortunate situation, I hope that's resolved soon.

21          All right, so I'm going to set your end for fact

22  discovery.  Let me just see what the last day of the year would

23  be and what week it is.  It's a Friday, so 12/31/21 for fact

24  discovery, Rule 26 disclosures will be within two weeks, so

25  let's see, that will be the 23rd.

 1              MS. FADDIS:  Your Honor, if I may, if I could request

 2   three weeks for Rule 26 disclosures, only because at this time

 3   we don't know how long our outage is going to last.  Hopefully

 4   it's not much longer, but in the event this carries into next

 5   week, it may be difficult for us to meet a two-week deadline.

 6              THE COURT:  That's fine.

 7              MS. FADDIS:  Thank you.

 8              THE COURT:  I'll make it 21 days from today.

 9              Then, let's see, initial request for production of

10   documents and interrogatories, why don't we say...July 19th for

11   those requests.

12              I like to have the deposition cutoff be a month before

13   the end of fact discovery because lawyers being lawyers, they

14   leave everything to the last minute for the depositions, and

15   then when there's something that needs follow-up, they won't

16   have left themselves time, so I'm going to make the discovery

17   deposition cutoff November 30th just to give you a cushion

18   should you need it.

19              Is anybody expecting expert discovery?

20              MR. ROTHMAN:  At this point I think it's unlikely.

21              THE COURT:  I'm just going to write "TBD," and I'll

22   ask Mr. Clark to find us a date for our conference in the new

23   year.

24              And while he's doing that, let me alert you to a pet

25   peeve of mine.  I know Mr. Radi has heard this particular rant

1  from me before, but I have a pet peeve about requests for

2  discovery extensions that come on the eve of the cutoff or, god

3  forbid, after the cutoff.  I understand that sometimes there's a

4  good reason why you need an extension, the client's in a coma,

5  you have a two-month trial, your computer system was hacked,

6  whatever it is, if you have a good reason and you bring it to my

7  attention promptly when you know about it, I will be reasonable

8  and you will get your extension, but if I get a letter on

9  December 28th saying, "oh, well, we've completed paper

10  discovery, but we have a few more depositions to take," that's

11  going to tell me that you haven't been paying attention to the

12  case because surely you knew before then that you were not going

13  to make your deadline, so if I think you don't have a good

14  reason for not making the deadline or I think you weren't

15  diligent about asking for an extension or if I can't really

16  understand why you need one or if it's clear that there's just

17  been inattention, I've been known to say no.

18          You'll see that my case management plan has a

19  procedure you should follow if the other side's not playing ball

20  discovery-wise.  The same principle applies if it's a third

21  party that's not playing ball.  Under that procedure, which

22  you'll see in the case management plan that will go up later

23  today, you'll see that you have to bring discovery disputes to

24  my attention on a fairly short timeline.  That's because I want

25  to get involved and keep you on track, so if you come in at the

1  next conference and you tell me, "well, I couldn't depose

2  so-and-so because so-and-so still owes me documents," I'm going

3  to say, well, so-and-so's in the doghouse for not giving you the

4  documents, but you're in the doghouse for not bringing it to my

5  attention, so you're both outta luck.

6          I mention this not because I expect any problems in

7  this case, I say this whenever I enter a scheduling order,

8  because once in a while, lawyers come in at the next conference

9  and they act surprised that I thought my scheduling order was an

10  order when they took it as more like a suggestion, so now you

11  know I have a bee in my bonnet on the subject.

12          And let's hear, Mr. Clark, what you've come up with

13  for a conference.

14          THE DEPUTY CLERK:  Yes, Judge.  January 13th, 2022, at

15  ten a.m.

16          THE COURT:  January 13th, 2022, at ten a.m.

17          If anyone's contemplating a motion at that time, let

18  me have the pre-trial on December 30th, the response on January

19  6th, and we'll talk about it on January 13th.

20          Also, if along the way you get to the point where you

21  want to talk about resolving the case and it would be helpful to

22  have the magistrate judge or a mediator get involved, I am happy

23  to facilitate that.  I don't know -- and you need not say, Ms.

24  Faddis, what your officers will say about probable cause, but if

25  all they had was black male in a bomber jacket, it doesn't look

1  too good, so should anybody get to that point and you want me to

2  refer you, let me know, but maybe there's a lot more to it than

3  that, so we'll wait and see.

4          Anything else we should talk about this morning?

5          MR. ROTHMAN:  Your Honor, in terms of any letter that

6  Mr. Radi will be sending concerning the Fourth Amendment claims

7  for the box-cutter, may I respond some -- within a week

8  thereafter?

9          THE COURT:  Sure.  But I'm hoping maybe you'll resolve

10 the whole thing with New Rochelle, but, if not, sure.

11         MR. ROTHMAN:  Thank you.

12         THE COURT:  Mr. Radi, if you're going to send a letter

13 on the Fourth Amendment issues, can you do it in two weeks?

14         MR. RADI:  Yes.

15         THE COURT:  All right, and then, Mr. Rothman, you'll

16 respond within a week.  All right.

17         MR. ROTHMAN:  Thank you, Judge.

18         THE COURT:  Good, this will force you to talk between

19 now and then.

20         All right, everybody take care.

21         MR. ROTHMAN:  Thank you, Judge.

22         THE COURT:  Be well.

23         MR. RADI:  Thank you, Judge.

24         MS. FADDIS:  Thank you, Your Honor.

25         THE COURT:  Bye-bye.

Bench Ruling            Jackson v. City of New York                    41

1              Certified to be a true and accurate transcript.

2

3              _____

4              TABITHA DENTE, SR. COURT REPORTER

5              Certified to be a true and accurate transcript.

6

7              _____

8              TABITHA DENTE, SR. COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25